# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-1568V

|  |  |
|---|---|
| LYNDSEY LANGLEY, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Filed: November 3, 2025 |
| Respondent. | |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Alexa Roggenkamp, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT[1]

On November 12, 2020, Lyndsey Langley filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on October 22, 2018, she suffered a left shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition at 1 (ECF No. 1). The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner has carried her burden of proof in establishing that she suffered a Table SIRVA injury, and therefore is entitled to compensation.

## I.    Relevant Procedural History

After the claim's initiation, Petitioner filed updated medical records as well as affidavits supporting her claim. On December 8, 2021, Respondent filed a status report indicating he was interested in a litigative risk settlement and invited Petitioner to submit a demand. (ECF No. 17). Thereafter, the parties negotiated for approximately 11 months but were unable to reach a compromise. Subsequently, on December 12, 2022, Respondent filed his Rule 4(c) Report in which he contested entitlement. (ECF No. 26). On November 15, 2023, Petitioner filed the instant Motion for Ruling on the Record regarding entitlement. (ECF No. 28). Respondent filed his Response brief on December 7, 2023. (ECF No. 29). Petitioner filed a Reply brief on January 26, 2024. (ECF No. 31). The matter is now ripe for disposition.

## II.    Relevant Medical History

### A.  Medical Records

Petitioner received a flu vaccine in her left shoulder on October 22, 2018, at her place of employment. Ex. 1. The following day, she saw Family Nurse Practitioner Kelly Gregory at Community Physician Group ("CPG"). Ex. 4 at 15. Petitioner complained of left arm pain that started the day before, after receiving a flu vaccination at work. *Id*. Petitioner reported "pain in the upper arm, and shoulder is radiating down the arm and up the back into the neck." *Id*. Upon examination, Petitioner did not have any focal site tenderness, bruising, or swelling. *Id*. FNP Gregory noted Petitioner had a reduced range of motion ("ROM") due to discomfort, which was worse when raising her arm and wrote that the cause of petitioner's symptoms "is unclear, may be related to technique of influenza vaccine, potential inflammatory response from the vaccine or proximity to nerves." *Id*. FNP Gregory recommended Petitioner use anti-inflammatories, an arm sling, and a warm compress. *Id*.

On October 25, 2018, three days after vaccination, Petitioner had an initial evaluation with certified Physician Assistant Wade Hudson at Missoula Bone & Joint ("MBJ"). Ex. 5 at 7. She reported left shoulder pain, and that she received a flu vaccine on October 22nd but that her symptoms of pain did not begin until "later that evening" and worsened overnight. Id. PA-C Hudson documented Petitioner as having pain with left shoulder active ROM and difficulty with activities of daily living ("ADLs"). *Id*. at 7-8. After reviewing petitioner's shoulder x-ray, PA-C Hudson noted "normal bony contours[,] good

joint spaces[,] no fractures. She has type I acromion." *Id.* at 9. He assessed Petitioner with shoulder impingement, and noted she had "developed subacromial and possibly subdeltoid bursitis secondary to a flu immunization." *Id.* He asked Petitioner to return for a follow-up appointment in six weeks. *Id.*

On November 2, 2018, Petitioner attended her initial physical therapy ("PT") evaluation at Active Physical Therapy and Sports Injury ("APS"). Ex. 6 at 116. Petitioner attended a total of nine PT sessions throughout November and early December 2018. Ex. 6 at 99-117. On November 6, 2018, she returned to PA-C Hudson with complaints of no improvement in her left shoulder. Ex. 5 at 11. Petitioner was still wearing her sling and reported her pain as an eight out of ten. *Id.* PA-C Hudson documented no changes from Petitioner's physical examination. *Id.* His assessment remained shoulder impingement and included "traumatic subacromial bursitis secondary to an influenza vaccine." *Id.* at 13. He administered a shoulder steroid injection and noted decreased pain and increased ROM in Petitioner "within minutes." *Id.* On November 28, 2018, petitioner telephoned PA-C Hudson and reported ongoing shoulder pain and difficulty with ADLs. Ex. 5 at 15. Petitioner underwent a left shoulder MRI on December 3, 2019, which showed subacromial subdeltoid bursitis and no evidence of a rotator cuff or labral tear. *Id.* at 15, 65.

On December 6, 2018, Petitioner returned to MBJ, and this time saw orthopedist Gary Willstein, M.D. Ex. 5 at 18. At the visit, Petitioner described severe left shoulder pain (primarily "anterior" pain which radiated down the arm), with no improvement from PT or steroid injection, and she was concerned that her condition was worsening. *Id.* Dr. Willstein observed:

> [p]atient's pain is definitely out of proportion to her [MRI] findings. We have seen this [a] number of times after flu shots. They usually recover with a steroid injection and PT[,] but patient has had no results. There is a possibility that there could be an underlying infection in the subacromial space secondary to the flu shot.

*Id.* at 19. Dr. Willstein recommended Petitioner undergo aspiration under ultrasound guidance to investigate, which he performed on December 20, 2018. *Id.* at 21. The ultrasound revealed no fluid collection and there was no indication that an aspiration was needed. *Id.* Petitioner also received an ultrasound guided subacromial bursal corticosteroid injection. *Id.*

On January 17, 2019, Petitioner returned to MBJ and reported the injection significantly helped her pain, which she stated was a two out of ten at that visit. Ex. 5 at

23. Petitioner reported returning to most of her routine work activities and denied any numbness or tingling. *Id.* Dr. Willstein recommended petitioner seek additional PT. *Id.* at 24. On January 28, 2019, seven weeks after Petitioner completed her first course of PT, she attended a re-examination at APS. Ex. 6 at 91. Petitioner felt her condition was improving but she continued to have left shoulder pain, mostly at night when sleeping. *Id.* Petitioner completed twenty-one PT sessions between January 28, 2019, and July 8, 2019. *Id.* at 35-89.

On March 7, 2019, Petitioner followed up with Dr. Willstein, who noted her shoulder was "progressing slowly" but that she had "developed a small component of adhesive capsulitis and tightness." Ex. 5 at 27. He recommended another steroid injection, pending approval from the worker's compensation benefits provider. *Id.* Petitioner underwent her third steroid injection at MBJ on April 5, 2019. *Id.* at 29. On April 18, 2019, Petitioner saw Dr. Willstein, who reported Petitioner was "very happy" with the results of her injection and therapy. *Id.* at 31. Petitioner reported a pain level of "1.5/10." *Id.* Dr. Willstein noted that Petitioner's adhesive capsulitis appeared to have almost resolved, and that Petitioner "has been doing all of her rotation[s] now, passively I can get her to 180 degrees on forward flexion." *Id.* at 32. The record also indicates Petitioner had returned to full work duties. *Id.*

On June 7 and July 8, 2019, Petitioner reported at her final two PT sessions that her left shoulder condition was gradually worsening with increased pain. Ex. 6 at 35-38. Petitioner believed her steroid injection was "wearing off" and was hesitant to consider additional injections. *Id.* On July 30, 2019, Petitioner returned to Dr. Willstein, who noted Petitioner's shoulder condition had "[s]lowly worsened back to where it is bothering her every day." Ex. 5 at 34-35. Petitioner had slightly reduced ROM in her shoulder and reported her pain as a 3/10 with active ROM. *Id.* Dr. Willstein discussed possible next steps: surgery or another injection. *Id.* Petitioner's preference was to undergo surgery. *Id.*

On August 28, 2019, Petitioner underwent a left shoulder arthroscopy with debridement, a biopsy of the subacromial bursa, and arthroscopic subacromial decompression. Ex. 9 at 114. On September 10, 2019, Petitioner had a post-surgical evaluation with Dr. Willstein and was recovering as expected. Ex. 5 at 42. The next day, Petitioner attended her third evaluation for PT at APS. Ex. 6 at 28. Petitioner attended eleven PT sessions between September 11, 2019, and November 8, 2019. *Id.* at 4-22. On November 8, 2019, at her final PT session, Petitioner reported she had returned to work as a bus driver but still experienced discomfort in her left scapular area. *Id.* at 4. She was instructed to continue with home exercises and return to PT, as needed. *Id.*

On October 10 and November 21, 2019, Petitioner attended follow up appointments with Dr. Willstein. Ex. 5 at 47; 50-51. Petitioner continued to improve but still had "range pain and some weakness." *Id.* at 47. After completing PT, Dr. Willstein noted Petitioner's left shoulder strength was 5/5 throughout with 160-degree flexion and abduction. *Id.* at 50-51. On December 13, 2019, Petitioner returned to MBJ and received a fourth steroid injection. *Id.* at 53. During the visit, Petitioner reported left shoulder pain and episodic weakness and limited ROM in her left arm and was diagnosed with "frozen shoulder." *Id.* On January 13, 2020, Petitioner presented to MBJ for her fourth PT evaluation. *Id.* at 66. Petitioner described her left shoulder ROM deficits, persistent pain, and difficulty with ADLs. *Id.* She also reported tightness in her neck and upper trapezius, causing headaches three to four times a week. Id. Petitioner reported her prior arm numbness and tingling had resolved. *Id.* Petitioner attended four PT sessions at MBJ between January and February 2020, with little to no documented change in her condition. *Id.* at 66-78.

On February 17, 2020, during her final PT visit, Petitioner's therapist recommended she defer PT until she was assessed by a physician. Ex. 5 at 78. On February 25, 2020, Petitioner returned to Dr. Willstein and reported continued shoulder stiffness and pain ("1.5/10"). *Id.* at 57. Petitioner underwent a left shoulder x-ray, which was unremarkable. *Id.* at 57. Dr. Willstein assessed Petitioner with left shoulder adhesive capsulitis and recommended a closed manipulation under anesthesia, which Petitioner underwent on May 13, 2020. Ex. 5 at 62. Between May 14, 2020 and July 10, 2020, Petitioner completed an additional nineteen PT sessions. *Id.* at 9-18; Ex. 12 at 94-145. On May 26 and June 25, 2020, Petitioner attended follow up appointments at MBJ. Ex. 12 at 61-63. Petitioner reported her pain levels were 2/10 and 1/10. *Id.* At both visits she had lingering ROM limitations, but she believed her condition was improving. *Id.*

On July 10, 2020, at Petitioner's last PT visit, she reported that "everything is great" and she felt "like today can be her last day." Ex. 12 at 144-45. She demonstrated slight functional weakness of the left upper extremity compared to the right and was instructed to continue home exercises. *Id.* On August 6, 2020, Petitioner saw Dr. Willstein, who noted "almost all of her pain is gone. She is very happy where she is now." *Id.* at 65-66. On examination, she had full strength and full ROM in her left shoulder. *Id.* He instructed Petitioner to follow up with his office as needed. *Id.*

### B. Witness Statements

Petitioner has submitted two short, signed affidavits in support of her Petitioner. The first, executed on November 5, 2020, asserts that she received a vaccination on October 22, 2018, that she sustained left shoulder injuries as a result, that she suffered

5

the effects of this injury for more than six months, that she has never had a left shoulder injury prior to vaccination, and that she has never received an award or settlement for her alleged injury nor has she ever filed a civil action. Ex. 13 at 1. In her second affidavit, Petitioner indicates that she struggled with inflammation in her hands between 2015 and 2017, that this inflammation resolved when she removed dairy from her diet, and that she never saw a neurologist for numbness and tingling in her hands. Ex. 15 at 1.

### III.    Parties' Respective Arguments

Petitioner argues that preponderant evidence establishes that she is entitled to compensation for her Table SIRVA claim. Motion at 1. Respondent argues that Petitioner has failed to meet her burden because she has not shown that her pain and reduced range of motion was limited to her left shoulder. Response at 8. Respondent specifically argues that the records establishes that Petitioner's symptoms affected other parts of her left arm and neck, including her left forearm, left armpit, and upper trapezius. *Id.* at 9.

### IV.    Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## ANALYSIS

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the

duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for his injury.  *See* § 11(c)(1)(A)(B)(D)(E).

contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

### 1. Petitioner has no Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Here, there is no evidence that Petitioner suffered from left shoulder pain before her October 22, 2018 vaccination. Respondent has also not made any argument suggesting he believes that Petitioner had a prior left shoulder condition or injury. Accordingly, Petitioner has met the first QAI requirement.

### 2. Pain Occurs with the Specified Timeframe (Onset)

A petitioner must show that she experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)). Once again, Respondent has not argued that Petitioner's left shoulder pain began after 48-hours, nor would the record allow me to make such a finding. Indeed, Petitioner sought treatment for her shoulder the very next day after receiving the flu vaccination and once again two days later. Ex 4 at 15; Ex. 5 at 7. Throughout her entire treatment course, the records reflect a consistent account that Petitioner's pain started later that evening and worsened overnight. Accordingly, Petitioner has met the second QAI requirement.

### 3. Petitioner's Pain and Limited Range of Motion was Limited to her Left Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)). Respondent argues that Petitioner's symptoms were not limited to her left shoulder because she complained of pain in other locations on four separate occasions: first, on October 23, 2018, one day after vaccination, when Petitioner complained of "Pain in the upper arm, and shoulder . . . radiating down the arm and up the back into the neck" (Ex 4 at 15); second, on November 2, 2018, during a PT evaluation when she reported sharp

Case 1:20-vv-01568-UNJ    Document 36    Filed 12/05/25    Page 10 of 12

shooting nerve pain along the lateral aspect of her arm, armpit, and anterior forearm (Ex. 6 at 116-17); third, when she reported similar symptoms to her orthopedist the following month (Ex. 5 at 18); and fourth on January 13, 2020, when she reported tightness in her neck and upper trapezius that was causing headaches three to four times a week (Ex. 5 at 66). Respondent concludes that because Petitioner's course of treatment was not limited to left shoulder pain, she has not satisfied this Table criteria. Response at 9-10.

In the Program, special masters have found that SIRVA claims featuring complaints of pain *primarily* occurring in the shoulder are valid under the Table, even if there are additional allegations of pain extending to adjacent parts of the body. *K.P. v. Sec'y of Health & Hum. Servs.*, No. 19-65V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022) (holding that "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body").

The fact that a claimant has raised complaints of pain elsewhere physically does not automatically disqualify the claim as a SIRVA. Indeed, the gravamen of the third QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced [ROM] indicative of a contributing etiology *beyond* the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Hum. Servs.,* No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (emphasis added); *Werning v. Sec'y of Health & Hum. Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder"); *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding that "despite the notations of pain extending beyond the shoulder, Petitioner's injury is consistent with the definition of SIRVA and there is not preponderant evidence of another etiology"). Resolution of this QAI, like all elements of a Table claim, involves a preponderant balancing of proof – and if that balancing suggests *primarily* shoulder concerns, that is enough.

Here, Petitioner in some isolated circumstances reported instances of pain extending beyond the shoulder, but her injury and diagnoses (specific to shoulder joint pathology) were otherwise consistent with SIRVA, and she was treated accordingly, with her shoulder as the focus. *See,* e.g., *Durham v. Sec'y of Health & Hum. Servs.,* No. 17-1899V, 2023 WL 3196229, at *11-13 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (finding "this is not a case where the medical records reflect that the symptoms beyond the confines of the shoulder are incidental to what was otherwise clearly treated as a shoulder injury," as the petitioner showed prominent symptoms of radiculopathy/numbness into the hand and neck, there ultimately was not any confirmed final diagnosis of a shoulder joint pathology,

and a cervical etiology was deemed more likely by physicians). The evidence supporting SIRVA-related symptoms of shoulder pain and limited ROM here outweighs the incidental complaints of pain stemming *from* the shoulder into the upper extremity and neck (that ultimately did *not* receive a separate diagnosis). I also note that Petitioner's complaints of trapezius pain happened over two years after vaccination and subsequent to Petitioner's first surgical procedure, and therefore would have no bearing on entitlement to compensation.

Accordingly, Petitioner has satisfied the third QAI requirement for entitlement.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Once again, there is insufficient evidence in the record to suggest an alternative cause of Petitioner's left shoulder issues and Respondent does not argue that there is any evidence of another condition or abnormality. There is no serious contention that Petitioner's initial symptoms were brought on by anything other than her vaccination. Accordingly, I find that Petitioner has satisfied the fourth QAI requirement for entitlement.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly on October 22, 2018. Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 4; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to her left shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id.* Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

11

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from October 24, 2018 (48 hours after vaccination), the records undoubtedly demonstrate that Petitioner suffered the residual effects of her shoulder injury for more than six months. Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## Conclusion

**In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will be entered following the issuance of this ruling to direct the parties of the next steps in resolving damages.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

12